J. R. JONES, plaintiff in error, *vs.* J. W. LATHROP & COMPANY, defendants in error.

When certain foreign bills of exchange were drawn by the defendants, as the shipping agents and factors of the plaintiff, payable to his order, though not signed by the defendants as agents, but drawn by them upon the grounds of the sale of the plaintiff's cotton as his agents, and under his instructions, according to the known and usual custom of the trade in such cases, and not on their own account, they not having received any valuable consideration therefor from the plaintiff, as the drawers of said bills, and the plaintiff having received the bills so drawn without objection, and, by his conduct, with full knowledge of the facts, having ratified the acts of the defendants, as his agents and factors, in selling his cotton and in drawing the bills so as to enable him to receive the proceeds thereof, according to the usage and custom of the trade:

*Held,* That, under the facts of this case, the defendants were not individually liable to the plaintiff as the drawers of the bills, but acted merely as his agents and factors in drawing the same, and on his account, and not on their own account. McCAY, Judge, dissenting.

Bills of exchange. Agency. Before Judge SCHLEY. Chatham Superior Court. January Term, 1871.

Jones brought "complaint" against J. W. Lathrop & Company on their five bills of exchange, each of which was as follows:

"Exchange for £200. SAVANNAH, July 9th, 1867.

"Sixty days after sight of this first of exchange, (second and third unpaid,) pay to the order of J. R. Jones two hundred pounds sterling, value received, and charge the same to account of Yours, etc.,

"J. W. LATHROP & CO."

"To Mr. ROBERT HUTCHISON,
"Liverpool, England."

The defendants pleaded the general issue, and that they drew the bills, not on their own account, but as Jones' agents, to get Jones' money from Hutchison, which he held as the proceeds of Jones' cotton, which Hutchison had received from

them as Jones' agents, and had sold on Jones' account, and that Jones held the bills till Hutchison broke.

On the trial, after putting in evidence the bills, the following correspondence was read. On the 10th of April, 1867, Jones wrote defendants that he had instructed Rust & Johnston to ship certain cotton to them, " with the ultimate view of shipping it to Liverpool, which you have probably done before this time." He added, " If you think best for my interest to sell the cotton for foreign bills of exchange, you will please procure them, if possible, in small amounts," etc. And " when instructed by my factors in reference to the sale of the cotton, you will please at once write to me of your instructions from Messrs. Rust & Johnston, and of yours to your factors or partners in Liverpool, to whom you have shipped the cotton."

On the 21st of May, he again wrote them, saying, " In reference to the cotton shipped by you to Liverpool, for my account," to prevent misconstruction by " your factor or cotton merchant in Liverpool, you will instruct your factor in Liverpool," by telegram, to sell at once.

On the 31st of May, they wrote Jones that they were advised of the sale of his cotton, and would render an account of sales as soon as they received one. In reply, Jones wrote them, on the 15th of June, 1867, saying that if his cotton was sold for foreign exchange, or gold, first to make a separate statement of a part of the cotton, and send United States currency for that, sell enough exchange to pay expenses, and remit balance in $1,000 00 amounts each, " as you receive the payments of the cotton," except any fractional amount, which he wished in United States currency.

On the 10th of July, they rendered him his account with them, and sent the said five bills, and certain United States currency to foot the balance due him. In it they advised him that these bills were fluctuating in value, etc., and said if he wished " to sell the bills, or any part of them, we will attend to it, if you desire." The account sent him, " J. R.

Jones, in account with J. W. Lathrop & Company " gave him credit by " net proceeds in Liverpool; eighty-five bales cotton, £1,284.18.7, at 148, $8,451 98," and balanced by expenses of said bills.

On the 6th of October, 1867, Jones wrote them that he wished to sell the sterling exchage, £5,000, " you procured for me last spring," and asked their advise as to market, etc. On the next day he wrote them that he had, before writing last, disposed of all the exchange but £1,000, and wrote £5,000 by mistake.

On the 8th of October they advised him of the state of the market, said they were willing to assist him in selling his exchange, and directed it sent to them. On the 10th, they acknowledged receipt of his letter of the 7th, and again made suggestions as to the state of the market. On the 20th, Jones wrote that he had sent the bills per express to them, and " am confident you will, in my interest, do the best you can for me in the sale of the bills," and gave them full discretion in the premises. He asked them to buy certain pork, and take its price out of the proceeds of the bills. On the 25th, they advised him that he had sent only the seconds and thirds of the bills, and that they could not be used without the firsts also. On the 28th, Jones forwarded the firsts, saying his omission was from ignorance of commercial usage, and told them when they sold to deduct their commissions and send him balance in United States currency.

On the 5th of November, they wrote him that, ten days before, there was a rumor that Hutchison was broke, which prevented sale of the bills; that, by later advices, they learned he had failed, because, as was supposed, of the failure of the Royal Bank of Liverpool, of which he was a director; saying that their letters of 19th from him gave no intimation of such thing, and it had surprised every one in Savannah who knew how he stood financially. On the 15th November, Jones replied, stating his surprise at the news, from what he had heard of Hutchison, saying, " the loss of the money will be

a terrible blow to me, financially speaking. I feel very blue on the subject. You will keep me posted," etc. On the 12th, Jones wrote: "After some little reflection as to the *status* of the sterling bills, I have concluded to say to you, until further developments in reference to the condition of the bills, you will please send the sterling bills back to me, or a copy of them, for the present. Keep me advised as to the new developments in reference to them. On the 23d, he again wrote, saying he had not received the bills, or a copy, and saying, "if nothing by this time or by the 1st day of December next, should be heard satisfactory as to the full or partial solvency of the bills, please send them per express to me, with all information as to Hutchison," and closed with a promise to pay for the pork, which was to have been paid for out of the proceeds of the bills. Defendants put in evidence the account of sales rendered to them by Hutchison, which were headed as follows: "Accounts sales of eighty-five bales cotton, per Sullivan, from Savannah, sold by Robert Hutchison on account of J. R. Jones, Esq., per J. W. Lathrop & Company," and an account current headed "J. W. Lathrop & Company, in account current with Robert Hutchison," in which proceeds of Jones' cotton was placed to the credit of J. W. Lathrop & Company.

Lathrop testified that, about the 1st of February, 1867, they received the cotton from Rust & Johnston with no other instructions but to ship to their correspondent at Liverpool. Rust & Johnston knew Hutchison was their correspondent, and knew his standing as well as they, and that they had no house in Liverpool. They paid Jones in cash, etc., all proceeds of sale except said foreign bills, and that the above accounts current were received soon after the sales. They had no interest in the proceeds, and disposed of it as Jones directed. He testified that the bills were drawn according to the custom of merchants; that, according to such custom, the shipper here was but the agent of the owner of the cotton, and that Hutchison was undoubtedly good till about the 19th

Jones *vs.* Lathrop & Company.

of October, 1867, and that they lost heavily by his failure. Several other witnesses testified, also, to Hutchison's high standing, the date and cause of his failure, the said custom of merchants, and how they, also, had lost by his failure.

Jones, in rebuttal, testified that he gave no instructions except what was in said letters, and authorized Rust & Johnston to give no. other; that he made no complaint of anything done by defendants up to the time of sending back the bills for sale, and invested in the bills for political reasons.

The defendants waived all right of defense based upon the failure of plaintiff to present the bills of exchange, in suit for acceptance or payment, after the bankruptcy of Robert Hutchison had been ascertained.

After argument had been heard, the Court was requested, in writing, by the counsel for plaintiff, to charge the jury as follows:

1. That where an agent, having received special instructions from his principal in regard to any transaction, departs from such instructions, he makes himself personally responsible to his principal for all loss which may result from such departure; and that, consequently, should they (the jury) find, from the evidence, that the plaintiff directed the defendants to sell his cotton for foreign bills of exchange, and that the defendants have not, in effect, followed that direction, the plaintiff is entitled to a verdict.

2. That, to constitute a bill of exchange, two parties are absolutely necessary: the drawer and the drawee: Chitty on Bills, margin 24. And unless the bill be made payable to the drawer's own order, a third party, the payee, to whom, in the absence of any qualifying condition appearing upon the face of the paper itself, the drawer becomes responsible for the amount of the bill, in case it should be dishonored. And that, consequently, should they find that the plaintiff directed the defendants to turn his cotton into foreign bills of exchange, and that, in compliance with his instructions, the defendants sold his cotton and transmitted to him the bills in

Jones *vs.* Lathrop & Company.

suit, unaccompanied by any qualifying explanation, and that the plaintiff received the bills as being responsive to his order, it followed, as a legal consequence, that the defendants, as drawers, became liable to him as payee for the amount of the bills, in case they should be dishonored.

3. That, if the testimony discloses that the defendants were acting, in the sale of the cotton in question, as factors for the plaintiff, then, in return for "the peculiar confidence reposed" by him in them, the law required of them "greater and more skillful diligence" in carying out his instructions and protecting his interests than had they been ordinary agents, "and the most active good faith:" Code, 2085.

4. That a bill of exchange, payable at or after sight, differs materially from a bill payable at a specified time, in the duty of its presentation for acceptance by the holder; that, while it must be presented within a reasonable time, there is no general rule of law defining what is such reasonable time, and that this question must be decided by the peculiar circumstances of each case, and depends very much upon the intention of the parties, drawer and payee, to the bill itself. That, consequently, should they find from the evidence that, at the time the bills in suit were sent by the defendants to the plaintiff, it was the *intention* of the plaintiff not to present the said bills promptly for acceptance nor yet to put them immediately into circulation, and that this intention was known to the defendants, and that they made no requisition or condition in regard to presentment or circulation, these circumstances bear upon the question of reasonable diligence on the part of the plaintiff, and must be taken into consideration by them: Chitty on Bills, 314, 315, Cap. 9; Bingham, 416.

5. That the right of defense by a drawer or an indorser of a bill of exchange because of *laches* by the holder in its presentation for acceptance and payment may be *waived;* that while in the case of an indorser such waiver must be express, in the case of a drawer it may be implied; and that, conse-

quently, should they find from the testimony that, after the bills had been retained for a time by the plaintiff, they were sent by him to the defendants for the purpose of being put by them into circulation, and they made no objection to selling the bills because of the antecedent delay, but, on the contrary, actually offered them for sale, this fact is testimony from which a waiver may be implied : Chitty on Bills, Cap., page 573.

His Honor, referring to these requests *seriatim*, and declining to give each of them in form and manner as put, charged the jury as to each generally, in the following language :

1. If you find from the evidence that the defendants departed from the instructions of the plaintiff without justifying cause, and that the plaintiff suffered damage by reason of such departure, you will give to the plaintiff whatever damage he has sustained by reason of this failure to obey such instructions.

2. That while it is true, generally, that a drawer is liable on his draft upon its dishonor by the drawee, yet this principle must always be considered in reference to the relation of the drawee and payee. For instance, suppose defendant had been plaintiff's clerk drawing on funds of plaintiff under his instructions, the defendant would certainly not be liable to plaintiff on failure of payment by the drawee, simply because he was the drawer. Now, apply this principle to this case. If you find that defendant was merely the agent of plaintiff, acting under *his* instructions, and drawing on plaintiff's own funds, he cannot be liable because the draft was dishonored.

3. This request I give you in charge as good law, still, if defendant was plaintiff's factor he would not be liable, unless it has been shown that he did not act with the most active good faith.

4. This request necessarily assumes that the defendant was not acting in the capacity of agent for plaintiff. For, otherwise, it is, in my judgment, not applicable to this case. It

Jones *vs.* Lathrop & Company.

applies in a case of an ordinary bill of exchange, purchased by the payee from the drawer, and when the payee must exercise due diligence in presentation for acceptance or payment in order to hold the drawer, who stands in the relation of an indorser on a promissory note.  I therefore charge you as requested, if you find that defendant sold these drafts to the plaintiff for value received.  But if you find that the defendant was not a *drawer for value*, and was acting in obedience to instructions, and followed them out, the risk was on the plaintiff, and the defendant is not liable for the dishonor of these bills.

5. This request is based on the assumption that the defendant was a drawer for value.  It assumes a contract in the beginning on the part of defendant to be liable in case the drawee failed to pay.  If you find facts in proof which sustain this conclusion, then a waiver of diligence in presenting these drafts may be implied from the fact (if you find it) that defendants received the drafts without protest, to sell them. But I charge you that the law herein requested cannot apply to this case, if you find that defendant was an agent acting under instructions of his *principal.*

Having gone through with plaintiff's requests to charge, I now charge you further that, if the facts be (and this you are to find, *pro* or *con*, from the evidence before you,) that plaintiff shipped his cotton to defendant, and instructed him to ship it to Liverpool for sale, and the defendant obeyed instructions, and the plaintiff drew a part of the money, when he could have drawn it all, and elected to allow the amount of these drafts to remain in the hands of the *house* to which the cotton was shipped; and if you further find that that house was one of good standing, to which, at the time of shipment, no suspicion of any kind attached, and that defendant never had reason to suspect its solvency or integrity from the time of shipment to the failure of that house, so as to be in duty bound to put the plaintiff on notice that his funds were in danger of loss—if you find these facts, I charge you

that the defendant is not liable for any part of plaintiff's loss. Even had the house of Hutchison failed before payment of any of the funds, the defendants would not be liable if the credit of that house was undoubted when the cotton was shipped under instructions, (if you find that such instructions were given,) and the defendants had not been guilty of *laches* in endeavoring to get the money for the sale.

I can see no difference between such a case and a case where a factor has sold a planter's cotton, and is ready to pay over the money, and the planter elects to take part and instructs the factor to place the remainder in a solvent bank, and the factor obeys the order, and then gives to the planter a check on the bank to draw the money when he may choose. If the planter sees proper to hold the check until the bank, solvent when the check was given, becomes insolvent, the factor cannot be liable because his name is to the check. The money was the planter's; he ordered it left in bank, and the check is signed by the factor in no other capacity than as his agent. The sixty days after sight does not vary the principle; for, when a man engages in commercial transactions in any place, he is bound, at his peril, to acquaint himself with the usages of trade and commerce. Local usages enter into commercial contracts. And should you find that it is the established commercial usage between Savannah and Liverpool, that exchange bills are drawn at sixty days' sight, and you find that plaintiff ordered bills of exchange, he was bound to know the usage regulating such exchanges, and ignorance of the law will not excuse him.

The jury found for the defendants. Whereupon, the plaintiff applied for a new trial, upon the following grounds: The Court erred 1st. In refusing to charge the jury in manner and form as first, secondly, thirdly, fourthly, and fifthly requested by counsel for the plaintiff. 2d. In using the following language, " While it is true, generally, that a drawer is liable on his draft upon its dishonor by the drawee, yet

this principle must always be considered in reference to the relation of the drawer to the payee. For instance, suppose defendant had been plaintiff's clerk drawing a fund of plaintiff's, under his instructions, the defendant would certainly not be liable to plaintiff, on failure of payment by the drawee, simply because he was the drawer. Now, apply this principle to this case. If you find that defendant was merely the agent of plaintiff, acting under *his* instructions, and drawing on plaintiff's own funds, he cannot be liable, because the draft was dishonored," instructed the jury as to a state of facts not proven by the evidence. 3d. In charging the jury as follows : " But if you find that defendant was not a drawer for value, and was acting in obedience to instructions, and followed them out, the risk was on the plaintiff, and the defendant is not liable for the dishonor of these bills," his honor instructed them as to a state of facts not proven to have existed. 4th. In intimating to the jury that the fifth request of plaintiff was based upon an assumption of facts which might not have existed, and that the bills of exchange sued upon differed from ordinary bills of exchange in this : that they, the jury, might find from the evidence that the defendants, in drawing them, were acting simply as agents for the plaintiff, and under his orders, when there was nothing whatever in the evidence to warrant such instructions. 5th. Because he erred throughout his charge in diverting, by his reasoning and his illustrations, the attention of the jury from the procurement and the transmission of the bills of exchange, and the offer and subsequent undertaking to sell them by the defendants, and fixing it upon the relationship existing between them and the plaintiff, as his agents, for the shipment and sale of his cotton, thereby misleading the jury as to the true issue before them, and applying to that issue assumptions of fact which had no foundation whatever in the evidence. 6th. Because the verdict was against the charge of the Court. 7th. Because the verdict was against the evidence. 8th. Because the verdict was against the law.

The new trial was refused, and error is assigned on said grounds.

LYON, DeGRAFFENREID & IRVIN ; JACKSON, LAWTON & BASSINGER, for plaintiffs in error.

FLEMMING ; HARDEN & LEVY, for defendants.

WARNER, Judge.

This was an action brought by the plaintiff against the defendants as the drawers of five bills of exchange, dated, Savannah, 9th July, 1867, for two hundred pounds each, payable to the order of the plaintiff in London at sixty days after sight, and directed to Robert Hutchison, Liverpool, as the drawee thereof.   The defendants pleaded that, in advancing these bills, they acted merely as the factors and agents of the plaintiff in shipping his cotton to Liverpool to be sold there, and that the bills were drawn by them upon the proceeds of the sale of the plaintiff's cotton as his agents, and under his instructions, according to the known and usual custom of the trade in such cases, and not on their own account, and that they had not received any valuable consideration therefor from the plaintiff as the drawers of said bills.   It appears from the evidence in the record, that, at the time these bills were drawn, Hutchison, to whom the cotton was shipped and upon whom the bills were drawn, was of good credit and standing as a merchant, but before the bills were presented for payment he became insolvent.   The evidence, on the trial, was quite voluminous, much of it being the written correspondence between the parties in relation to the sale of the cotton, and as to the sale of these sterling bills now sued on, which had been delivered to the plaintiff by the defendants.   The jury returned a verdict for the defendants.   A motion was made for a new trial on the grounds set forth in the record, which was overruled by the Court, and the plaintiff excepted.   This action, it will be observed, is brought

Jones *vs.* Lathrop & Company.

against the defendants as *the drawers* of these bills of exchange, and is not brought against them for any neglect of duty as *the factors and agents of the plaintiff*, and the question is, whether the defendants were liable to the plaintiff as such drawers of the bills of exchange under the evidence disclosed in the record. The general rule of the law is, that the drawer of a bill of exchange is liable for the payment thereof according to its tenor and effect to the payee named therein, and is founded on the theory that the drawer has funds in the hands of the drawee which he sells or assigns to the payee for a *valuable consideration.* Such is the general presumption of the law. But this original presumption of the law, as between the original contracting parties, may be rebutted and overcome by the facts of the case as between them. What are the facts of this case? The plaintiff had eighty-five bales of cotton, which he desired to have shipped to Liverpool and sold there, and to receive in payment therefor sterling bills, and for that purpose he sent his cotton to the defendants as his factors and agents in the city of Savannah. The cotton was received by the defendants on or about the 28th of January, 1867, who were instructed to ship the same to their correspondent in Liverpool for sale. In obedience to these instructions, the defendants shipped the cotton to Hutchison, their correspondent, who received and sold the same, rendering an account of the sale of the cotton to the defendants, dated, Liverpool, 5th June, 1867. This account of the sale of the cotton rendered by Hutchison is thus stated: "Account of sale of eighty-five bales cotton, per Sullivan from Savannah, sold by Robert Hutchison for account of J. R. Jones, Esq., per Messrs. J. W. Lathrop & Company." The cotton was not sold on account of the defendants, but on account of the plaintiff, and the proceeds of the sale was not the property of the defendants, but the property of the plaintiff. To enable the plaintiff to receive the proceeds of the sale of his cotton in the hands of Hutchison, the defendants' correspondent in Liver-

pool, these bills were drawn according to the usage and custom of the trade in such cases, and were sterling bills in the commercial sense of that term. The evidence in the record shows that the usage and custom of the trade was to draw sixty days' bills, as was done in this case by the commission merchant in Savannah shipping the cotton, that it was the custom to put the proceeds of cotton sold at Liverpool to the credit of the merchant shipping, but the accounts at Liverpool showed to whom the cotton belonged, and no person except the merchant shipping the cotton could draw for the proceeds of the sale thereof who would settle with his principal to whom the cotton belonged ; that the accounts rendered in this case were according to the usage and custom of the trade. These bills, therefore, were, in fact, drawn by the defendants, as the shipping factors and agents of the plaintiff, to enable him to receive the proceeds of his cotton shipped by them to Liverpool, and sold there under his instructions, according to the usage and custom of the trade, and were not drawn by them in favor of the plaintiff for any *valuable consideration received by them from him therefor.* After these bills were drawn, and the account of sales of the cotton had been rendered to the plaintiff, the same were delivered to him who retained them in his possession nearly three months *without objection,* and in the meantime corresponded with the defendants as to the best time when to dispose of them at the highest rate of premium, as sterling bills, and finally transmitted the same to them to sell for him as his agents, when, in their judgment, they could realize the highest market value therefor.

As late as October 20th, the plaintiff wrote the defendants to purchase for him three barrels of pork, and deduct the price thereof from the sale of the bills of exchange, then in their hands for sale. After the defendants had informed the plaintiff of the failure of Hutchison, he wrote them, on the 8th November, "The loss of the money will be a terrible blow on me, financially speaking. I feel very blue on the subject.

Jones *vs.* Lathrop & Company.

You will please keep me regularly advised of any new developments in the matter, and, *for me,* see what can be made out of the matter." Again, on the 23d of November, he wrote them, stating that, "if, by the 1st of December next, nothing satisfactory is received or heard from Mr. Hutchison, and you see no reasonable chance to make anything out of the bills for the present, or at an early day, to reimburse you for the pork sent to me, I will remit the money to·you for the pork." It is quite apparent that, up to that time, the plaintiff did not consider the defendants were personally liable to him as the drawers of these bills, and he then had full knowledge of all the facts.

The relation of principal and agent arises whenever one person expressly, or by implication, authorizes another to act for him, or subsequently *ratifies* the acts of another in his behalf: Code, 2152.

The form in which the agent acts is immaterial; if the principal's name is disclosed, and the agent professes to act for him, it will be held to be the act of the principal: Code, 2169. The plaintiff's name was disclosed by the defendants as the owner of the cotton, when shipped to Hutchison by them, as the agents of the plaintiff, and the account was rendered as the proceeds of the sale of the plaintiff's cotton, according to the usage and custom of the trade, and not as the defendants' cotton. The agent's authority will be construed to include all necessary and usual means for effectually executing it: Code, 2170. According to the evidence in this case, the drawing these bills by the defendants, as the factors and shipping agents of the plaintiff, was the necessary and usual means to enable them, as such agents, to obtain the proceeds of his cotton in sterling bills. Where the agency is known, and the credit is not expressly given to the agent, he is not personally responsible upon the contract. The question to *whom* the credit is given, is a question of fact, to be decided by the jury in each case: Code, 2185. As between the defendants and the plaintiff, their agency in the shipment

of his cotton to Liverpool, and the procuring sterling exchange for the proceeds thereof, according to the usual custom of the trade, was well known to him, and the question whether the plaintiff received the bills from them, on their credit, as the drawers thereof, or on the credit of the proceeds of his own cotton, shipped and sold by them in Liverpool, as his agents, was a question to be decided by the jury, under the evidence in the case. Whatever might have been the liability of the defendants, as the drawers of these bills, if the same had been negotiated and in the hands of a *bona fide* holder for value, it is not necessary to discuss in this case.

The main, controlling question, as presented by the record, is, whether the defendants are personally liable to the plaintiff as the drawers of these bills of exchange, under the facts and circumstances of the case. In our judgment, they are not, and as there is no material error in the charge of the Court to the jury, or in refusing to charge as requested, and the verdict being right, under the law applicable to the facts of the case, we are of the opinion that the judgment of the Court below should be affirmed.

Judgment affirmed.

LOCHRANE, Chief Justice, concurred, but wrote no opinion.

McCAY, Judge, dissenting.

1. I do not concur with the majority of the Court in their judgment in this case. Under the evidence, I think Lathrop & Company liable to Jones on these bills, and that the Court erred in his charge to the jury, suggesting to them that Mr. Lathrop was no more liable on these drafts, if he was Jones' agent, than if he had drawn them as the clerk of Jones. If Lathrop & Company were only the agents of Jones *in drawing the drafts*, this would, perhaps, be true; but the charge was calculated to mislead the jury, because the fact of Lathrop & Company's agency for Jones in the *shipment*,

*sale*, etc., of the cotton was undisputed. The question was as to the agency in *drawing the drafts*. The former agency might exist, and not the latter. This was the whole point of the case. The charge of the Court was too broad. Under the circumstances, the jury might have understood the Court to hold that Lathrop's agency in the shipment of the cotton and the procurement of its sale was intended.

2. Under the proof, I am of opinion that, in the drawing of these drafts, Lathrop & Company were acting for themselves and not for Jones, and that they are liable to him as drawers. The proof is conclusive, to-wit: the evidence of Mr. Duncan. Mr. Lathrop himself and others swore that the account upon which these bills were drawn was the account of Lathrop & Company, not Jones.

Mr. Lathrop testified that, at the beginning of the season, he had a credit with Hutchison for £10,000. It is clear, from the statements of the witnesses, that Jones' cotton, when sold, was carried to the *credit* on Hutchison's, on the books of Lathrop & Company, that Hutchison would not have recognized a draft drawn by Jones, and that a draft drawn by Lathrop & Company in favor of *anybody else* than Jones would have been a *perfectly legitimate* draft, as the accounts stood, and as was usual with merchants. It was in proof that the interest on any balance there might be in Hutchison's books to Lathrop's credit went to Lathrop. It is clear, from the testimony, that no change would have been required *on Hutchison's* books if Lathrop & Company had paid Jones the money for his cotton, and drawn these drafts in favor *of some one else*. Indeed, that was proven to be the usual course of business. Planters rarely want drafts of foreign houses. Ordinarily, the commission merchant at Savannah pays the planter the money, and sells the exchange. Who can say that the very funds for which Jones' cotton sold was not paid by Hutchison to some *other draft* of Lathrop? It appears that Lathrop did a large business with him, was constantly shipping planters' cotton to him, having the pro-

ceeds carried to *his own credit*, and selling exchange to *any purchasers who might* want it at sixty days after sight, upon the fund. In my judgment, the proof is conclusive on this point. The fund on which these bills were drawn was the fund of *Lathrop & Company*. It was to *their* credit on Hutchison's books, they were authorized to draw, and did draw on it, in favor of anybody they pleased. The interest on the money and the rise and fall of exchange was theirs. Had they been short with Hutchison the credit arising from the sale of this cotton would have gone to pay their debt to him. In other words, according to the course of dealing between Hutchison and Lathrop, the account on Hutchison's books, against which these bills were drawn, was constantly and regularly considered by Hutchison and Lathrop & Company as the account *of Lathrop & Company*. When the balance was large in his favor he was able to sell large sums of foreign exchange, and when it was small he had little to sell. Nothing is better settled than that a factor who sells goods for a third person, and mingles the proceeds with his own funds, as by a deposit to his general account in bank, is liable for what may happen to the funds.

This Court, at this term, in the case of *A. C. Wiley & Company vs. Burnet & Rixey*, held that a factor who sold his client's tobacco for Confederate money, and mingled the money with his own funds, was liable for the value of the money at the time, notwithstanding he always had on hand a plenty of Confederate money to pay. The ground upon which this decision went, was the acknowledged rule that a factor who mingles his principal's money with his own is liable for it, no matter what happens to the general bulk; since, by this act, he has made it impossible to separate the fund of the principal and his own fund. The evidence in this case shows, as I think, conclusively, that the proceeds of the cotton was carried to Lathrop & Company's credit, by the usual course of dealing, to which Lathrop & Company gave their assent; that it went to *swell their credit with Hutchison*, and was, to

all intents and purposes, *as much in use* by Lathrop & Company as their *own fund*, on which they could and did draw and sell bills in the market, as though they had deposited every dollar of it with Hutchison, with their own hands. It was their own money, in their own power, to their own credit, in their own use, from the day on which the cotton was sold, and, in all probability, when the *drafts were drawn*, it had been paid out to their order. They *owed* Jones this money. They were not mere bailees of it. And they drew these drafts, signed by themselves, *as drawers*, payable to *Jones' order*, in payment of it. No man, in his senses, not *intending* to be liable, *as drawer*, would have put his name to such drafts. Jones could, the next day afterwards, have put them on the market as ordinary bills of exchange, in which case the liability of Lathrop & Company would have been unquestionable. This very fact, that Lathrop & Company, old merchants and dealers in exchange, put their names, as drawers, without qualification, to negotiable bills, in favor of Jones, is almost conclusive that they *intended to be liable* on them. True, as between Jones and them, the truth may be inquired into. But the fact of their signature to drafts, which they knew Jones intended to sell, and which they proffered to sell for him, is utterly inconsistent with the idea that they did not *intend* to be liable as ordinary drawers.

There is nothing in this evidence to show, or to justify the inference, that any of the parties, either Jones, Hutchison, or Lathrop & Company, considered the proceeds of the cotton in Hutchison's hands the property of Jones. The witnesses all say that it was not subject to the draft of Jones. True, it does appear that the books of Hutchison would, by the course of dealing, show that the cotton from which the money came belonged to Jones. But, by all the witnesses, it is shown that, by the course of the trade, it was on the books to Lathrop & Company's credit, and was treated, by both Hutchison and Lathrop & Company, as belonging to the latter. Suppose Lathrop & Company, when they made out.

this account between themselves and Jones, in which they charged themselves with the proceeds of the cotton, and credited themselves with these bills, and the exchange on them, to balance, had taken the ordinary course. Suppose they had paid Jones the money, and drawn and sold these drafts in the market, payable to somebody else, and they had proven unavailable by Hutchison's failure, would Jones have been liable to pay back the money? Lathrop & Company would be his *agents* in one case as much as the other. The fund drawn upon would be the same in both cases, and Lathrop's character would remain the same. If he drew on Jones' fund, and the fund failed, Jones would be liable over to Lathrop & Company. If this be so the liability of planters, shipping cotton to Liverpool, to consignees selected by the sea-coast merchants here, is a dangerous business.

This case, I think, turns upon the character in which Lathrop & Company acted in drawing the drafts. The question of negligence in presenting them arises, it is true, but the proof is so strong of acquiescence in the delay, that, on this point, there is little difficulty. By the settled rule in such cases, the draft must be presented in a reasonable time. What is a reasonable time, depends on the facts of each case, and upon the intent of the parties. The evidence is clear that it was known and understood by Lathrop & Company that they would not be presented for a while; and, by their letters, they clearly so advised, and I do not think, under the law, the jury would have found for the defendants, in this point.